**FILED**

AUG - 6 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ARTICHOKE JOE'S CALIFORNIA GRAND CASINO, FAIRFIELD YOUTH FOUNDATION, LUCKY CHANCES, INC., OAKS CLUB ROOM, SACRAMENTO CONSOLIDATED CHARITIES, | CIV-S-01-1530 DFL/GGH |
| Plaintiffs, | MEMORANDUM OF OPINION AND ORDER |
| v. | |
| GALE A. NORTON, Secretary of the Interior, AURENE M. MARTIN, Acting Secretary of the Interior, RONALD M. JAEGER, Pacific Regional Director, Bureau of Indian Affairs, Department of the Interior, CITY OF SAN PABLO, and LYTTON RANCHERIA OF CALIFORNIA, | |
| Defendants. | |

Plaintiff card rooms and charities ("plaintiffs") bring suit against the Secretary of the Interior and the Pacific Regional Director of the Bureau of Indian Affairs (collectively,

115

1

"Secretary").   The City of San Pablo ("City") and the Lytton

Rancheria of California ("Lytton" or "the Lyttons") are

defendants in intervention.   Plaintiffs seek a preliminary

injunction to prevent the Secretary from taking certain land into

trust for Lytton located in San Pablo, California.   Plaintiffs

contend that Lytton's plan to conduct class II tribal gaming on

the trust site would violate federal law relating to Indian

gaming and deny plaintiffs equal protection under the Fifth and

Fourteenth Amendments.   Defendants move to dismiss the action.

The main bulk of the briefing on both motions is addressed to

whether Lytton properly has been recognized as a tribe by either

the Secretary or the Congress.   As will be explained, this issue

cannot and need not be resolved on the present record and

motions.

## I.   Facts and Procedural History

In 1926, the United States purchased fifty acres of land

located north of Santa Rosa in Sonoma County for the use of

homeless Indians.   (Pls.' Mot. for Prelim. Inj. at 3.)   The land

tract, called the Lytton Rancheria, was intended for the 102

members of the Dry Creek and Geyersville bands of Indians.[1]

(Id.; Fried Decl. Ex. F at 7.)   However, the Dry Creek and

Geyersville Indians never occupied the Lytton Rancheria.   In

---

[1]   Rancherias are small Indian reservations.   See, e.g.,
Duncan v. U.S., 667 F.2d 36, 38 (Ct.Cl. 1981) ("Rancherias are
numerous small Indian reservations or communities in California,
the lands for which were purchased by the Government (with
Congressional authorization) for Indian use, . . . a program
triggered by an inquiry in 1905-06 into the landless, homeless or
penurious state of many California Indians.").

1  1937, the Sacramento Indian Agency of the Department of the

2  Interior allowed Bert Steele and his brother-in-law, John Myers,

3  and their families, to move onto the Lytton Rancheria after

4  Steele's home was destroyed in a flood.  (Pls.' Mot. for Prelim.

5  Inj. at 3-4; Fried Decl. Ex. A, March 17, 1939 letter at 3.)

6  John Myers and Mary Myers Steele were members of the Pomo band of

7  Indians, based in Sonoma County.  (Id.)  Bert Steele was part Pit

8  Indian and part Nomalaki Indian.  (Pls.' Mot. for Prelim. Inj. at

9  4.)   The Geyersville Band protested the presence of the Steele

10  and Myers families on the Lytton Rancheria, but the Sacramento

11  Indian Agency allowed the families to stay.  (Id. at 5.)

12       In 1958, Congress terminated the federal trust in the

13  reservation land of over forty California rancherias, including

14  Lytton.  Cal. Rancheria Act, Public Law 85-671, 72 Stat. 619.

15  Eventually, the Lytton lots were all sold to non-Indians.  (Fried

16  Decl. Ex. F at 7-8.)  However, in 1987, the "Lytton Indian

17  Community" joined as plaintiffs in the case Scotts Valley Band of

18  Pomo Indians of the Sugar Bowl Rancheria v. United States, No. C-

19  86-3660 (N.D.Cal.).  (Pls.' Mot. for Prelim. Inj. at 6-7.)

20  Lytton and three other terminated California rancherias

21  challenged the 1958 terminations as invalid, because Public Law

22  85-671 § 3(c) required the federal government to "install or

23  rehabilitate . . . irrigation or domestic water systems [as

24  agreed]" before the land was distributed, or within a reasonable

25  time after the land was distributed.  Id. at 7.  According to

26  Lytton, the required water system improvements were never made on

1 the Lytton land.  Rapport Decl. Ex. D; Fried Decl. Ex. F at 8.

2 By this time, the Indian Gaming Regulatory Act ("IGRA") had been

3 enacted,[2] such that a successful outcome for the plaintiff

4 rancherias could open the way to Indian gaming on the rancherias.

5      In 1991, the Secretary and the four California rancherias

6 settled the Scotts Valley case.  (Pls.' Mot. for Prelim. Inj. at

7 8.)  The stipulation reached as part of the settlement stated

8 that the termination of the Lytton Rancheria was illegal and that

9 the Steele and Myers descendants were entitled to the rights and

10 benefits of individual Indians.  It provided that their lineal

11 descendants could organize under the Indian Reorganization Act

12 ("IRA").[3]  (Id.)  The Scotts Valley stipulation also assured

13 Alexander Valley/Sonoma County landowners, who intervened in the

14 suit, that the Lyttons would not conduct gaming in Alexander

15 Valley except in conformity with the County's general plan and

16 IGRA.  (Id.)  After the Scotts Valley judgment was entered, the

17 Secretary listed Lytton as a recognized tribe in the Federal

18 Register every time such notices were issued between 1992 and

19 2002.  (Lytton's Mot. to Dism. at 4.)

20      Since gaming is inconsistent with the Sonoma County general

21 plan, the Lyttons could not find land for a casino in Alexander

22 Valley, where the original Rancheria was located.  (Mejia Decl. ¶

23 5.)  With the assistance of outside investors, Lytton began to

24

25      [2]  See 102 Stat. 2467, 25 U.S.C. § 2701 et seq.

26      [3]  Whether the stipulation required Lytton to organize under
the IRA before federal recognition is a disputed issue.

search for property that could be taken into trust and used for gaming. (Lytton's Mot. to Dism. at 2; Pls.' Mot. for Prelim. Inj. at 10.)  Eventually, the San Pablo property, which is the focus of this dispute, was identified as a suitable gaming property by Lytton and its investors.  The property is within the San Francisco Bay Area and would be the first, or one of the first, Indian gaming casinos in a major urban area in California. The San Pablo property already had a card room operating on it, owned by Ladbroke's, a major gambling concern, and Lytton's investors purchased the property in anticipation of transferring ownership to Lytton.

In 2000, Lytton obtained a Lytton land trust provision in § 819 of the Omnibus Indian Advancement Act of 2000 ("Omnibus Act") that instructed the Secretary to take the San Pablo property into trust:

> Notwithstanding any other provision of law, the Secretary of the Interior shall accept for the benefit of the Lytton Rancheria of California the [San Pablo] land . . . .  The Secretary shall declare that such land is held in trust by the United States for the benefit of the Rancheria and that such land is part of the reservation of such Rancheria under sections 5 and 7 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 467).  Such land shall be deemed to have been held in trust and part of the reservation of the Rancheria prior to October 17, 1988.

Pub. L. 106-568 § 819, 114 Stat 2868.  The last portion of § 819 apparently exempts the property from § 20 of IGRA, which subjects gaming on lands acquired by the Secretary of the Interior after October 17, 1988 to additional requirements, chief among them the

1  approval of the Governor of the State.[4]  25 U.S.C. § 2719.

2  Because of this and related litigation, the Secretary has not yet

3  taken the land into trust for Lytton.  (Pls.' Mot. at 10, 12.)

4  See Artichoke Joe's v. Norton, 216 F.Supp.2d 1084 (E.D.Cal. 2002)

5  [hereinafter Artichoke Joe's I].

6       In 2001, Congress revisited the San Pablo land grant to the

7  Lytton Rancheria by enacting Public Law 107-63 § 128, providing

8  that: "The Lytton Rancheria of California shall not conduct class

9  III gaming as defined [by IGRA] on land taken into trust for the

10  tribe pursuant to [§ 819 of Omnibus Act] except in compliance

11  with all required compact provisions . . . or any relevant class

12  III gaming procedures."[5]  Although the import of this statutory

---

[4]   25 U.S.C. § 2719(a)&(b)(1)(A) provides:

   [G]aming regulated by this chapter shall not be
   conducted on lands acquired by the Secretary in trust
   for the benefit of an Indian tribe after October 17,
   1988, unless . . . the Secretary, after consultation
   with the Indian tribe and appropriate State and local
   officials, including officials of other nearby Indian
   tribes, determines that a gaming establishment on newly
   acquired lands would be in the best interest of the
   Indian tribe and its members, and would not be
   detrimental to the surrounding community, but only if
   the Governor of the State in which the gaming activity
   is to be conducted concurs in the Secretary's
   determination . . . .

[5]   IGRA divides tribal gaming into three categories.  Indian
tribes exclusively regulate class I gaming consisting largely of
social games with small prizes.  25 U.S.C. §§ 2703(6), 2710(d).
Class II gaming includes certain types of bingo, as well as card
games "that are explicitly authorized by the laws of the State,
or . . . are not explicitly prohibited by the laws of the State
and are played at any location in the State. . . ."  Id. §
2703(7)(A).  Both tribal governments and the federal government
regulate class II gaming.  Id. § 2710(d).  Class III gaming is
defined as all forms of gaming that "are not class I gaming or

language is unclear and disputed, it appears that at the least

Congress wished to allay fears that § 819 could be understood to

permit unregulated class III gaming on the San Pablo property.

Under IGRA, to conduct class III gaming, an Indian tribe

must negotiate a compact with the state.  The Governor of

California has informed Lytton that he will not negotiate with

Lytton about a gaming compact until Lytton has land in trust that

can be used for gaming.  (Hamerling Decl. Ex. G.)  The Governor

has also communicated to Lytton some concern about urban gaming:

"it is our understanding that the Tribe intends to acquire land

in a metropolitan area for the purpose of conducting class III

gaming.  Accordingly, there are numerous issues implicated by the

Tribe's intended acquisition."  (Id.)  Since it is not certain

that there will be a class III gaming compact in the immediate

future, plaintiffs allege that even so they face imminent

hardship from class II gaming, which Lytton could begin, without

a compact, as soon as the land is taken into trust.  Plaintiffs

allege that they are prohibited from conducting certain forms of

class II gaming, and hence would be placed at a competitive

disadvantage.  (First Amended Complaint ("FAC") ¶ 67.)

The Lytton Rancheria currently has 253 enrolled members, 122

---

class II gaming."  Id. § 2703(8).  While class II regulations
prohibit "electronic or electromechanical facsimiles of any game
of chance or slot machines of any kind," such machines are
permitted under class III gaming, as are house-banking, "Las
Vegas" style games.  Tribes cannot conduct class III gaming on
Indian land without first negotiating a gaming compact with the
state and gaining approval from the National Indian Gaming
Commission ("NIGC").  Id. § 2710(d)(1).

adults and 131 minors.  (Meija Decl. ¶ 6.)  Most of Lytton's members live near Healdsburg, close to the site of the old Rancheria land.  (Id.)  Many of Lytton's members live in economically depressed conditions; 15 percent are homeless, 90 percent do not have health insurance, 40 to 50 percent of the adults are unemployed, and many members experience persistent problems with alcohol abuse, chronic depression, and lack of education.  (Id. ¶¶ 6-7.)  Lytton's members do not plan to live on the San Pablo land parcel.  (Pls.' Mot. at 11.)  If the San Pablo land is taken into trust and the Lyttons are allowed to take control of the San Pablo Casino, the Lyttons plan to develop a fifty acre parcel in Windsor, California, in Sonoma County, which the Lyttons' financial backers now own for the Lyttons' benefit.  (Meija Decl. ¶ 15.)

Plaintiffs filed this suit on August 7, 2001.  They allege that (1) the Secretary violated the APA by listing Lytton as a federally recognized Indian tribe; (2) the § 819 Lytton land trust directive violates federal law because Lytton is not an "Indian tribe" under IGRA, the San Pablo site does not constitute "Indian land," and the municipal services agreement ("MSA") with San Pablo violates IGRA; and (3) if Lytton were allowed to conduct Indian gaming under IGRA at the San Pablo site, the plaintiff card rooms would be denied equal protection under the Fourteenth and Fifth Amendments of the Constitution.  (FAC ¶¶ 70-83.)  Plaintiffs request a preliminary injunction prohibiting the Secretary from taking the San Pablo land into trust.  Defendants

1   move to dismiss the action as nonjusticiable.

2                  II.   Motion to Dismiss

3        Many of plaintiffs' claims turn on their contention that

4   Lytton is not a validly recognized Indian tribe.  Defendants move

5   to dismiss all such claims on the basis that the validity of

6   federal tribal recognition is a nonjusticiable political

7   question.  Defendants also move to dismiss the remaining claims

8   as follows: the Tenth Amendment and Enclaves Clause claims for

9   lack of standing; the statutory IGRA claims on the basis of

10  standing and ripeness; the challenge to the Scotts Valley

11  stipulation as time-barred; and the claim that § 128 of P.L. 107-

12  63 supersedes § 819 of the Omnibus Act for failure to state a

13  claim upon which relief can be granted.

14  A.   Judicial Review of Federal Recognition

15       The Supreme Court has consistently treated tribal

16  recognition decisions by Congress or the executive as entitled to

17  a large degree of deference.  Indeed, the Court's first

18  pronouncement on the reviewability of tribal recognition

19  decisions might suggest that such decisions are unreviewable and

20  that the courts lack jurisdiction to entertain any challenges to

21  tribal recognition:  "In reference to all matters of this kind,

22  it is the rule of this court to follow the action of the

23  executive and other political departments of the government,

24  whose more special duty is to determine such affairs.  If by them

25  those Indians are recognized as a tribe, this court must do the

26  same."  United States v. Holliday, 70 U.S. (3 Wall.) 407, 419

1  (1866).   Later decisions, however, have clarified that the

2  discussion in Holliday does not foreclose all review but rather

3  sets a high standard of judicial deference.   In Baker v. Carr,

4  369 U.S. 186, 215-216, 82 S.Ct. 691, 709-710 (1962), the court

5  gave the status of Indian tribes as an example of a political

6  question, but then noted that "courts will strike down any

7  heedless extension of th[e] ['distinctly Indian'] label.   They

8  will not stand impotent before an obvious instance of a

9  manifestly unauthorized exercise of power."

10      Thus, while according great deference to executive decisions

11  on tribal status, courts have found such decisions reviewable at

12  least when the Secretary recognizes an Indian tribe under

13  specific Congressional mandates or agency regulations.   See,

14  e.g., Cherokee Nation of Oklahoma v. Babbitt, 117 F.3d 1489, 1496

15  (D.C.Cir. 1997) ("Although the principle of deference does not

16  require a court to avoid the question of sovereignty, a 'proper

17  respect for both tribal sovereignty itself and for the plenary

18  authority of Congress in this area cautions that we tread lightly

19  in the absence of clear indications of legislative intent.'")

20  (citation omitted).   Courts apply the "arbitrary and capricious"

21  standard for review of agency action to recognition decisions

22  where the "executive branch has . . . sought to canalize the

23  discretion of its subordinate officials by means of regulations

24  that require them to base recognition of Indian tribes on the

25  kinds of determination, legal or factual, that courts routinely

26  make." Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of

the Interior, 255 F.3d 342, 348 (7th Cir. 2001) (citing Hein v.
Capitan Grande Band of Diegueno Mission Indians, 201 F.3d 1256,
1261 (9th Cir. 2000)).

Accordingly, initial review is appropriate at least to
determine whether Lytton has been recognized as a tribe according
to cognizable standards or wholly outside of any regulations or
judicially manageable standards.  See James v. Dept. of Health
and Human Services, 824 F.2d 1132, 1137-39 (D.C.Cir. 1987)
(reviewing the tribal status of the Gay Head Indians only to
decide that the acknowledgment regulations were applicable
standards, then deferring to the Department of the Interior,
which had not yet been given a chance to apply those
regulations).

Plaintiffs challenge the Secretary's decision to settle the
Scotts Valley case and to list Lytton as a tribe.  (See, e.g.,
Pls.' Consolidated Reply at 20.)  They assert that the Secretary
did not follow the applicable regulations in determining Lytton's
status.[6]  (Id.)  The Secretary's response is not entirely clear.
In her initial briefing she asserted that Lytton was recognized
under the Indian Reorganization Act ("IRA").  (Fed. Defs.' Opp'n
at 10-11.)  However, in supplemental briefing, the Secretary
maintained that Lytton was recognized on the date the Scotts
Valley stipulation was signed, independent of any IRA

---

[6]  Plaintiffs argue that the Secretary should have followed
the recognition regulations at 25 C.F.R. § 83 et seq.  (Pls.'
Consolidated Reply at 20.)

11

1  organization.[7]  (Fed. Defs.' Suppl. Brief. at 2-3.)  If the

2  latter characterization were correct, it might follow that the

3  Secretary's decision to recognize Lytton was not the result of a

4  considered application of independent standards and would not be

5  reviewable, assuming that it was not a "manifestly unauthorized

6  exercise of power."  Baker, 369 U.S. at 215-216.

7      At this stage of the litigation, the court does not have

8  enough information to determine whether the Secretary recognized

9  Lytton under the IRA or whether the Secretary made a recognition

10 decision that was political in the sense that it was independent

11 of any regulation or standard.  Defendants' motion to dismiss

12 plaintiffs' tribal status claim as a political question is denied

13 without prejudice to its renewal on a clearer record.

14     B.  Standing for Tenth Amendment and Enclaves Clause Claims

15     Defendants move to dismiss plaintiffs' Tenth Amendment and

16 Enclaves Clause claims for lack of standing.

17     1.  Tenth Amendment Claim

18     The complaint asserts that the removal of the San Pablo

19 property from state regulatory control into a federal trust,

20 without the IGRA procedures applicable to lands taken into trust

21 after 1988, would violate the Tenth Amendment.  In Tennessee

22 Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 143-44, 59

23 S.Ct. 366, 372-73 (1939) [hereinafter "TVA"], the Supreme Court

24

25     [7]  The Secretary notified the court that Lytton "has not
26 completed the final procedures for approval of [a tribal
   constitution] pursuant to the IRA."  (Fed. Defs.' Suppl. Brief
   Regarding Lytton's Tribal Status at 1.)

1  held that a private power company did not have standing to make a

2  Tenth Amendment challenge "absent the states or their officers. .

3  . ." See also Nance v. EPA, 645 F.2d 701, 716 (9th Cir. 1981).

4      The State of California is not a party to this case; indeed,

5  it specifically declined to intervene.  (Notice by State of

6  California of Intent Not to Intervene, 12/27/2002).  The Supreme

7  Court has not overruled its holding in TVA.  See City of

8  Roseville v. Norton, 219 F.Supp.2d 130, 147-49 (D.D.C. 2002)

9  (noting Seventh and Eleventh Circuit case law allowing private

10  party standing, but holding that courts must continue to follow

11  TVA until overruled).  Because the plaintiffs do not act with the

12  authority of the State of California or its officers, they do not

13  have standing to assert a Tenth Amendment claim.  Defendants'

14  motion to dismiss plaintiffs' Tenth Amendment claim is granted.

15          2.  Enclaves Clause Claims

16      The complaint also asserts a claim under the Enclaves Clause

17  similar to the Tenth Amendment claim.  "The Enclaves Clause

18  requires the consent of a State before the federal government may

19  establish an enclave within a State's territory that is

20  exclusively subject to federal legislative authority."

21  Roseville, 219 F.Supp.2d at 149 (citing U.S. Const., Art. I, § 8,

22  cl. 17).  As with the Tenth Amendment claim, plaintiffs attempt

23  to don the mantle of the State to protect its interest in

24  jurisdiction over land within its borders.  They lack standing to

25  do so for the same reasons that they lack standing to assert the

26  Tenth Amendment claim.  Id. at 145-46 (prohibition on third party

standing bars private party from bringing claims under the Enclaves Clause).   Defendants' motion to dismiss the Enclaves Clause claim is granted.

### C.   The Primary Beneficiary Claim

One of plaintiffs' claims under IGRA is that "[t]he Lyttons will not be the 'primary beneficiaries' of the San Pablo gaming operation, in violation of . . . [s]ections 2702(2) and 2711 of IGRA."   (FAC ¶ 75(c).)   Plaintiffs allege that Lytton will not be the "primary beneficiary" of San Pablo gaming profits because of the deal made by Lytton with its outside investors and Ladbroke, the previous owner of the San Pablo Casino.   (Compl. ¶¶ 48-49.) The Secretary argues that this claim should be dismissed because (1) IGRA does not impose an enforceable requirement that the compacting tribe be the "primary beneficiaries" of gaming, (2) plaintiffs lack standing to challenge the Lyttons' share of gaming profits, and (3) the claim is not ripe, because the National Indian Gaming Commission ("NIGC") has not yet approved the San Pablo management contract, as required under 25 U.S.C. § 2711.   (Fed. Defs.' Opp'n at 24.)

Section 3 of IGRA is a "declaration of policy" that states that one purpose of IGRA is to "provide a statutory basis for the regulation of gaming by an Indian tribe . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation. . . ."   25 U.S.C. § 2702.   Although the "primary beneficiary" provision is simply a declaration of policy, not a statutory provision with a private right of action, plaintiffs rely on §

2711(b)(5) and § 2711(c), which include specific protections for tribal interests in gaming.  (Pls.' Reply at 44 n.52.)   Section 2711(b)(5) provides that the NIGC Chairman may only approve a casino management contract if the contract term does not exceed five years, unless other (specified) circumstances justify a longer term.   Section 2711(c) requires the Chairman to disapprove management contracts where the non-tribal management entity receives more than thirty percent of net gaming revenues.[8] Plaintiffs have alleged, without further explanation,"that the Lyttons' financial arrangements with the City of San Pablo and with their other non-Indian investors violate these rules." (Pls.' Reply at 44 n.52; FAC ¶¶ 75(d), 84(h).)

There is no IGRA provision that explicitly gives non-tribes private rights of action under § 2711(b)(5) and (c), and it seems doubtful that plaintiffs could have standing under the APA to challenge a decision by the NIGC Chairman that would have no effect on them.   But even if standing could be shown, there is no decision by the NGIC to challenge under the APA.   Accordingly, plaintiffs' statutory IGRA claims are not ripe.   See Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1044 (9th Cir.1999). Defendants' motion to dismiss plaintiffs' claims under 25 U.S.C. § 2711(b)(5) and (c) is granted.[9]

_____

[8]   In certain circumstances, the fee may be up to forty percent of net revenues.  25 U.S.C. § 2711(c)(2).

[9]   Plaintiffs request that "the court stay rather than dismiss this aspect of plaintiffs' action so that it can be adjudicated as soon as the Lyttons seek approval from the NIGC for their management contracts."  (Pls.' Reply at 14 n.16.)  The

D.   Tribal Status Claim and the Statute of Limitations

Defendants assert that plaintiffs' challenge to Lytton's tribal status is barred by the six year statute of limitations for claims against the United States.  See 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.").  Defendants argue that because it has been more than six years since the Scotts Valley stipulation was reached and Lytton was first listed in the Federal Register as a recognized tribe, plaintiffs' claim is time barred.[10]  Plaintiffs agree that § 2401 applies, but argue that under Wind River Mining Corp. v. U.S., 946 F.2d 710 (9th Cir. 1991), their claim is not barred.

The rule in Wind River provides that notwithstanding the six year statute of limitations, substantive challenges to agency action can be made up to six years from the date the action was applied to the challenger.  Id. at 715-16.  The rationale of the Wind River decision is equally applicable to this action: "The government should not be permitted to avoid . . . challenges to its actions, even if ultra vires, simply because the agency took

court declines to stay the claim given that it is clearly premature and that plaintiffs' claim to standing is so tenuous.

[10]  As part of the substance of their tribal status claim, plaintiffs assert that Lytton can only obtain federal recognition through IRA reorganization, and that Lytton has not completed IRA reorganization.  Of course, if it turns out that Lytton has not actually finished the tribal recognition process under the IRA and that the stipulation requires that Lytton do so, plaintiffs' tribal status challenge could not be untimely.

the action long before anyone discovered the true state of affairs."  Id. at 715.

Plaintiffs' claim concerning recognition of Lytton as a tribe is a substantive challenge to the Secretary's recognition decision.  Further, when the Secretary made the decision to settle the Scotts Valley case and grant Lytton federal recognition in 1991, plaintiffs could have had no idea that Lytton's tribal status would affect them.  (Pls.' Reply at 11.) Lytton's previous home land was in Sonoma County, and there was no indication in the Scotts Valley settlement that Lytton would seek to conduct tribal gaming in San Pablo.  Even if they had known of the Scotts Valley stipulation and wanted to challenge it at the time, plaintiffs would not have had standing to do so. The only group with an interest in challenging the Secretary's recognition decision was the intervenor Alexander Valley landowners and the stipulation effectively removed any interest or incentive the landowners had in challenging the Secretary's decision by forbidding gaming by the Lyttons in Sonoma County. Thus, there was no one with standing to challenge the recognition decision at the time it was made.  For these reasons, the statute of limitations did not start running on plaintiffs' tribal status claim until IGRA gaming in San Pablo by the Lyttons became probable.  It follows that plaintiffs' claim is not barred by the six year statute of limitations.

///

///

E.   Inter-relation of § 128 and § 819: Failure to State a Claim

In the second claim of the First Amended Complaint, plaintiffs contend that Public Law 107-63 § 128 ("§ 128"), enacted in 2001, repealed the backdating provision in § 819 of the Omnibus Act.   (FAC ¶ 75(g).)   Section 819 provides that

> Notwithstanding any other provision of law, the Secretary of the Interior shall accept for the benefit of the Lytton Rancheria of California the [San Pablo Casino] land. . . .  The Secretary shall declare that such land is held in trust by the United States for the benefit of the Rancheria and that such land is part of the reservation of such Rancheria. . . .  <u>Such land shall be deemed to have been held in trust and part of the reservation of the Rancheria prior to October 17, 1988.</u>

Pub. L. 106-568 § 819, 114 Stat 2868 (emphasis added).  Section 128 states:  "The Lytton Rancheria of California shall not conduct class III gaming as defined [by IGRA] on land taken into trust for the tribe pursuant to [§ 819 of Omnibus Act] except in compliance with all required compact provisions . . . or any relevant class III gaming procedures."  P.L. 107-63 § 128.

Plaintiffs contend that the § 128 language requiring Lytton to meet "all required compact provisions or any relevant class III gaming procedures" must refer to 25 U.S.C. § 2719, which imposes additional requirements for gaming on lands acquired in trust after October 17, 1988.[11]  (Pls. Reply at 50-51.)  For that

---

[11]   25 U.S.C. § 2719(a)&(b)(1)(A) provides:

[G]aming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless . . . the Secretary, after consultation

18

1   reason, they argue that the § 819 provision backdating the San

2   Pablo land acquisition was repealed when § 128 was passed.

3       Plaintiffs' claim presents a difficult question of statutory

4   interpretation.  The relationship between the two sections is not

5   clear.  At the point in time that the Governor either enters into

6   a compact for class III gaming with Lytton or declines to do so

7   because of § 128, this statutory interpretation question must be

8   addressed.  Until that time, however, the statutory issue is not

9   ripe and may never arise.

10      Even if § 128 overrules § 819, and the San Pablo land

11  acquisition is not backdated, it does not follow that Lytton

12  cannot conduct class III gaming at San Pablo.  Section 2719 does

13  not forbid class III gaming on trust lands acquired after 1988

14  but permits the Governor to refuse to negotiate a class III

15  compact if he finds gaming would be detrimental to the

16  surrounding community.  Id.

17      At this time, Governor Davis has not begun, and may not

18  begin negotiations with Lytton about a class III gaming compact.

19  Or the Governor and the Secretary might make a determination that

20

21  ————————————

22          with the Indian tribe and appropriate State and local
            officials, including officials of other nearby Indian
23          tribes, determines that a gaming establishment on newly
            acquired lands would be in the best interest of the
24          Indian tribe and its members, and would not be
            detrimental to the surrounding community, but only if
25          the Governor of the State in which the gaming activity
            is to be conducted concurs in the Secretary's
26          determination . . . .

19

1  gaming is in the best interests of the Lyttons and the local

2  community.  Under both plaintiffs' and defendants'

3  interpretation, § 128 only addresses requisite procedures and

4  findings for entering into class III gaming compacts and it is

5  unclear from this vantage what compact procedures would be

6  followed and what determinations might be made by the Secretary

7  and Governor were a class III compact negotiation to occur.  P.L.

8  107-63 § 128; 25 U.S.C. § 2719(a)&(b)(1)(A).  At least at this

9  juncture, the court declines to address the merits of the § 128/§

10  819 claim when no class III gaming compact is imminent.

11  Defendants' motion to dismiss is therefore denied.

12              III.  Preliminary Injunction

13      To grant a preliminary injunction, the court must find

14  either (1) a combination of probable success on the merits and a

15  possibility of irreparable harm; or (2) the existence of serious

16  questions going to the merits where the balance of hardships tips

17  sharply in the moving party's favor.  Sammartano v. First

18  Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002).  Harm

19  and probable success on the merits are considered on a sliding

20  scale such that a stronger showing on one factor may balance a

21  weaker showing on the other.  Immigrant Assistance Project of Los

22  Angeles County Fed'n of Labor (AFL-CIO) v. I.N.S., 306 F.3d 842,

23  873 (9th Cir. 2002).

24      A.  Balance of Hardship

25      At oral argument, plaintiffs argued that they will suffer

26  immediate, irreparable harm if the Secretary takes the San Pablo

land into trust.   They assert that if the land is taken into
trust: (1) the Quiet Title Act will prevent them from challenging
the land trust in the future; (2) the Lyttons will commence class
II gaming that will draw business away from plaintiffs; (3) such
class II gaming will not be subject to state criminal
jurisdiction; and (4) the Lyttons may lease the San Pablo land to
another tribe with a class III gaming compact.   (Hr'g Tr. at
11:22-15:10; 75:11-76:12.)

### 1.   Quiet Title Act

Plaintiffs contend that once the San Pablo land is taken
into trust, they cannot challenge the Lyttons' possession of it
under the Quiet Title Act.   See 28 U.S.C. 2409a(a) ("The United
States may be named as a party defendant in a civil action under
this section to adjudicate a disputed title to real property in
which the United States claims an interest. . . .   This section
does not apply to trust or restricted Indian lands. . . .").
However, even if the Quiet Title Act would not allow plaintiffs
to challenge the San Pablo land trust, it is not tribal ownership
or possession of land in San Pablo that may harm plaintiffs; it
is tribal gaming.   The federal government has authority to take
land into trust for individual Indians and groups of Indians.
See United States v. McGowan, 302 U.S. 535, 539, 58 S.Ct. 286,
288 (1938) (holding that the federal government validly held land
in trust for the Reno Indian Colony, a group of homeless Indians
of several different tribes); United States v. Pelican, 232 U.S.
442, 448, 34 S.Ct. 396, 398 (1914) (holding that where federal

government held land in trust for individual Indians, "its power to make rules and regulations respecting such territory was ample."). Lytton's possession of the land under federal trust will not preclude review of plaintiffs' substantive claims concerning possible gaming at the site. Since Lytton's possession of the land does not itself harm plaintiffs, the Quiet Title Act will not prevent plaintiffs from redressing any future harm.

### 2. Class II Gaming

Plaintiffs assert that they will be harmed because Lytton will be able to commence class II gaming as soon as the land is taken into trust. In particular, plaintiffs assert that Lytton will be permitted to offer electronic bingo as class II gaming whereas under state law non-Indian card rooms are prohibited from offering any form of bingo while charitable organizations are limited to non-electronic bingo with jackpots no greater than $250.[12]

The IGRA definition of class II gaming includes "the game of

---

[12] California "prohibits bingo games that are not operated by members of designated charitable organizations or which offer prizes in excess of $250 per game." California v. Cabazon Band of Mission Indians, 480 U.S. 202, 222, 107 S.Ct. 1083, 1095 (1987); Cal. Penal Code § 326.5. Those entities that are allowed to conduct bingo games under Cal. Penal Code § 326.5 are not permitted to use electronic aids that eliminate the use of actual bingo cards. 67 Ops. Cal. Att'y Gen. 528 (1984) (prohibiting use of electronic bingo game played on facsimile of bingo card on the screen); 70 Ops. Cal. Att'y. Gen. 304, 308 (1987) (advising that any electronic bingo device replacing actual bingo cards is prohibited); 81 Ops. Cal. Att'y Gen. 415 (stating that card rooms could use an electronic aid in conjunction with bingo cards to notify a player when a game is won).

1  chance commonly known as bingo (whether or not electronic,

2  computer, or other technologic aids are used in connection

3  therewith)," 25 U.S.C. § 2703(7)(A)(i), but excludes "electronic

4  or electromechanical facsimiles of any game of chance or slot

5  machines of any kind." Id. § 2703(7)(A)(ii).  Class II gaming

6  additionally excludes house banking games.[13]  United States v.

7  103 Electronic Gambling Devices, 223 F.3d 1091, 1099 (9th Cir.

8  2000).  As class II gaming, a tribe can offer bingo on electronic

9  cards where the players compete against other players, who may be

10  at different locations, for jackpots that could become sizeable

11  depending on the number of players and whether the tribe

12  subsidizes the jackpot.   See U.S. v. 162 MegaMania Gambling

13  Devices, 231 F.3d 713, 721 (10th Cir. 2000).  But a tribe without

14  a class III compact cannot offer electronic bingo that is played

15  against a machine (the house) much like a slot machine.  Id. at

16  1093, 1103.  And, of course, a tribe without a compact cannot

17  offer slot machine gambling; indeed, the ability to offer slot

18  machines is the principal benefit of class III gaming.  Artichoke

19  Joe's I, 216 F.Supp.2d at 1098.

20     Plaintiffs claim that class II gaming in San Pablo would

21  decrease patronage of their businesses because Lytton would be

22  able to offer "unlimited jackpots," while plaintiff charities

23  would have to abide by the statutory $250 jackpot cap.  See,

24

25     [13]  A house banking game is "any game of chance that is
26  played with the house as a participant in the game, where the
   house takes on all players, collects from all losers, and pays
   all winners, and the house can win."  25 C.F.R. § 502.11.

e.g., Wilkinson Decl. ¶ 4.  But it is speculative as to how big the bingo jackpots may be at the Lytton facility and how powerful an incentive a large bingo jackpot would be to card-playing patrons of the card rooms or to players accustomed to charity bingo events.

Moreover, plaintiffs do not make a convincing case that electronic bingo games are "virtually indistinguishable" from slot machines.  (Eadington Decl. ¶ 7.)  There is little dispute that slot machines are a big draw.  Plaintiffs' expert, William Eadington, asserts that class II electronic bingo slot machines look just like Las Vegas style class III slot machines.  (Id. Exh. B.)  But the machines he points to have not yet been classified as class II by the NIGC.  At oral argument, counsel for Lytton characterized the pictured machines as "marginal machines," machines that look and play like class III devices, but are marketed as class II devices.  (Hr'g Tr. at 60:10-15.) Plaintiffs' counsel represented that Lytton would not use such machines.  (Id. at 60:16-21.)

The court relies in part on Lytton's counsel's representation that Lytton will not use "marginal" electronic bingo devices.  With that understanding, the differences in the type of bingo that some of plaintiffs currently conduct and that Lytton may conduct does not constitute great hardship to plaintiffs.[14]  Of course, there may be an increase in competition

---

[14]  This conclusion is supported by the declaration of plaintiffs' expert.  Exhibit A to the Eadington declaration is Eadington's opinion submitted to the court in the predecessor to

from an infusion of funds into the San Pablo site. But this could

occur if non-tribal owners purchased and revamped the San Pablo

Casino.  The advantages that Lytton would have from offering

class II gaming and electronic bingo cards are sufficiently minor

and speculative that they do not constitute substantial hardship.

### 3.  State Enforcement

Plaintiffs assert that because the State will not have

criminal jurisdiction over Lytton's casino once the San Pablo

land is held in trust, plaintiffs will experience hardship from a

lack of law enforcement.  However, there is no indication that

federal enforcement of federal gaming regulations will be less

stringent than state enforcement of state regulations.  Under

IGRA, the federal government and the tribe have concurrent

regulatory jurisdiction over class II gaming.  25 U.S.C. §

2710(d).  Under the Municipal Services Agreement between San

Pablo and Lytton, the City also has concurrent regulatory

jurisdiction.  (Krathwohl Decl. ¶ 9.)  The San Pablo police chief

asserts that as a member of the Gaming Commission that would

regulate gaming at the San Pablo site, he will have "unfettered

access" to non-public areas and surveillance tapes at the casino.

_____

this case, <u>Artichoke Joe's I</u>, 216 F.Supp.2d at 1084.  In that
case, plaintiffs challenged class III tribal gaming.  Eadington's
opinion was that such gaming would harm plaintiff card rooms and
charities because of the differences he described between class
III and class II gaming.  (Eadington Decl. Exh. A ¶ 17-20.)
Eadington's first declaration cites house-banking gaming and slot
machines as salient differences between class II and class III
gaming, and it is clear that Lytton will not be able to employ
either without a compact.

1 <u>Id.</u> ¶ 10.  Thus, there should not be a gap in oversight if Lytton

2 begins conducting class II gaming in San Pablo, and plaintiffs

3 have not provided any evidence that only state criminal

4 jurisdiction would be effective in enforcing class II gaming

5 regulations.

6                   4.  <u>Lease to Another Tribe</u>

7      Plaintiffs assert that Lytton may lease the San Pablo land

8 to a tribe with a class III compact and that this new tribe will

9 then begin class III gaming.  There is no basis in fact for this

10 speculation.

11      In short, none of plaintiffs' arguments establishes that

12 plaintiffs will experience significant hardship if the Secretary

13 takes the land into trust.  Their claim for injunctive relief

14 preventing such a transfer is weak partly because merely taking

15 the land into trust is not the source of plaintiffs' alleged

16 injury.  Rather, it is the prospect of class III gaming at the

17 site which plaintiffs fear.  For that reason, the harm plaintiffs

18 allege here is not irreparable.  Lytton cannot conduct class III

19 gaming under IGRA unless it is a federally recognized tribe.  25

20 U.S.C. § 2700 et seq.  Plaintiffs' ability to redress any injury

21 they may suffer when and if Lytton begins class III gaming is not

22 hindered by the court's order, which does not address the merits

23 of plaintiffs' attack on Lytton's tribal status or plaintiffs'

24 constitutional or statutory claims.

25      Finally, the danger of more substantial injury to plaintiffs

26 is not imminent, because class II gaming is not significantly

different from the gaming that plaintiffs can conduct, and Lytton does not have a class III gaming compact.  For all of these reasons, the balance of hardships does not tip sharply in plaintiffs' favor.

### B.  Likelihood of Plaintiffs' Success on the Merits

In light of the above discussion, for the court to enter a preliminary injunction prohibiting the Secretary from taking the San Pablo land into trust, plaintiffs must show that they have a probability of success on their claim for injunctive relief.

Congress has explicitly ordered the Secretary to take the San Pablo land into trust for Lytton.[15]  Omnibus Act § 819, Pub. L. 106-568 § 819, 114 Stat 2868.  The Secretary has recognized Lytton as an Indian tribe, a decision that is at least entitled to great deference, assuming it is reviewable at all.  See supra § II.A.  Neither the parties nor the court has found a single case where a court overturned the federal government's recognition of an Indian tribe.  Here, the Secretary is preparing to take land into trust for a group of Indians the Secretary has recognized as a tribe, under a specific Congressional mandate to

---

[15]  Plaintiffs argue that the court should not allow the Secretary to take the land into trust because § 819 only allows the Secretary to take land into trust for Lytton if Lytton is a tribe, and plaintiffs argue that Lytton is not a tribe.  Section 819 directs the Secretary to take land into trust "for the Lytton Rancheria of California."  Pub. L. 106-568 § 819, 114 Stat 2868. It does not condition the land grant on a determination of Lytton's tribal status.  In passing § 819, Congress may have assumed that Lytton was a tribe -- a reasonable assumption since Lytton was listed as a federally recognized tribe -- but Congress did not condition its direction to the Secretary on Lytton's tribal status.

take the land into trust.  The court does not foreclose plaintiffs' challenge to Lytton's tribal status or plaintiffs' constitutional claims relating to gaming.  But the immediate issue is not gaming, certainly not class III gaming, but a transfer of land pursuant to specific Congressional direction. Plaintiffs' arguments on the merits are not so strong as to outweigh the discretionary action of the Secretary backed by express Congressional authority and direction.

In sum, the harm that plaintiffs may face as a result of the taking of the San Pablo land into trust itself is not irreparable or substantial.  Nor have plaintiffs shown probable success on the merits of their claims limited to the land transfer.  For these reasons, plaintiffs' motion for a preliminary injunction is denied.

## IV.  Conclusion

For the reasons stated above, defendants' motion to dismiss is DENIED as to plaintiffs' tribal status claim and claim that Congress overruled § 819 of the Omnibus Act.  Defendants' motion to dismiss is GRANTED as to plaintiffs' Enclaves Clause claims, Tenth Amendment claims, and statutory IGRA claims.  Plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated:  *August 6, 2003* .

DAVID F. LEVI
United States District Judge

United States District Court
for the
Eastern District of California
August 6, 2003

* * CERTIFICATE OF SERVICE * *

2:01-cv-01530

Artichoke Joe's

v.

Norton

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on August 6, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

James Hamilton                          HV/DFL
PRO HAC VICE
Swidler Berlin Shereff Friedman LLP
3000 K Street NW
Suite 300
Washington, DC  20007

Robert V Zener
PRO HAC VICE
Swidler Berlin Shereff Friedman LLP
3000 K Street NW
Suite 300
Washington, DC  20007

Roger R Myers
Steinhart and Falconer
333 Market Street
Suite 3200
San Francisco, CA  94105

Edmund F Brennan
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Law Offices of David M Fried
214 Grant Ave
Suite 400
San Francisco, CA  94108

Michael V Franchetti
Franchetti and Rystrom
331 J Street
Suite 200
Sacramento, C  95814

Brian M Libow
City of San Pablo
One Alvarado Square
San Pablo, CA  94806

David J Rapport
Rapport and Marston
PO Box 488
405 West Perkins Street
Ukiah, CA  95482

Anthony Cohen
Clement Fitzpatrick and Kenworthy
P O Box 1494
3333 Mendocino Avneue
Santa Rosa, CA  95402


                                        Jack L. Wagner, Clerk


                                  BY: _____
                                        Deputy Clerk

United States District Court
for the
Eastern District of California
August 18, 2003


* * CERTIFICATE OF RESERVICE * *


2:01-cv-01530


Artichoke Joe's

    v.

Norton

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  August 18, 2003, I RE-SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


      James Hamilton                                 HV/DFL
      PRO HAC VICE
      Swidler Berlin Shereff Friedman LLP
      3000 K Street NW
      Suite 300
      Washington, DC  20007

      Robert V Zener
      PRO HAC VICE
      Swidler Berlin Shereff Friedman LLP
      3000 K Street NW
      Suite 300
      Washington, DC  20007

      Roger R Myers
      Steinhart and Falconer
      333 Market Street
      Suite 3200
      San Francisco, CA  94105

      Edmund F Brennan
      United States Attorney
      501 I Street
      Suite 10-100
      Sacramento, CA  95814

David Michael Fried
Law Offices of David M Fried
214 Grant Ave
Suite 400
San Francisco, CA  94108

Michael V Franchetti
300 Montgomery Street
Suite 415
San Francisco, CA 94104-1906

Brian M Libow
City of San Pablo
One Alvarado Square
San Pablo, CA  94806

David J Rapport
Rapport and Marston
PO Box 488
405 West Perkins Street
Ukiah, CA  95482

Anthony Cohen
Clement Fitzpatrick and Kenworthy
P O Box 1494
3333 Mendocino Avneue
Santa Rosa, CA  95402

Jack L. Wagner, Clerk

BY:  _____
        Deputy Clerk